**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
**ROBERT D. FRANCIS,**

        **Plaintiff,**       **REPORT AND**
                 **RECOMMENDATION**
  -against-
                 **20-CV-0642 (RRM)**
**CITY OF NEW YORK, et al.,**

        **Defendants.**
-----------------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

Currently pending before this Court is a motion filed by plaintiff Robert D. Francis ("plaintiff") to enforce a purported settlement agreement reached between the parties in connection with a settlement conference held before the undersigned magistrate judge on August 9, 2021. See Motion to Compel Settlement (Jan. 3, 2022), Electronic Case Filing ("ECF") Docket Entry ("DE") #50. For the reasons discussed below, this Court recommends that plaintiff's motion to enforce the settlement agreement be denied.

## THE UNDERLYING FACTS AND PROCEDURAL BACKGROUND

On February 5, 2020, defendant City of New York removed this action, alleging employment discrimination and civil rights violations, from the Supreme Court of the State of New York, County of Kings, to this Court. See Notice of Removal (Feb. 5, 2020), DE #1. Plaintiff, a retired New York Police Department ("NYPD") detective, alleges that the defendants—the City of New York, Deputy Commissioner Joseph Reznick, Assistant Chief Brian H. O'Neil, Deputy Chief Kerry R. Sweet, Captain Thomas E. Molloy, Captain Joseph F. Profeta, Lieutenant John A. Orecchia, Lieutenant Joel P. Varughese, Lieutenant John

Montaperto, and Sergeant Alex Nulman (collectively, "defendants")—deprived him of his right to remain silent and coerced him into signing a false confession; falsely arrested and maliciously prosecuted plaintiff; and denied him due process by depriving him of certain employment benefits.  See Second Amended Complaint (May 18, 2020) ¶¶ 195-220, 236-260, 266-69, 277-80, 282-301, DE #20.  More specifically, plaintiff was arrested by members of the Rockville Centre Police Department and signed a handwritten confession admitting to the charges brought against him.  See id. ¶¶ 195-220, 236-257.  As a result, the NYPD immediately suspended plaintiff without pay and filed internal disciplinary charges against him.  See id. ¶¶ 258, 262.  Ultimately, on April 10, 2017, plaintiff, acting "under duress," elected to separate from the NYPD pursuant to a vested interest retirement, effective on May 9, 2017, and was not administratively prosecuted.  See id. ¶¶ 266-68, 278-79, 283.  By separating pursuant to a vested interest retirement, plaintiff forfeited benefits that would have been available to him had he retired the following month, after 20 years on the force, pursuant to a service retirement, including "terminal leave" and variable supplement fund ("VSF") payouts.  See id. ¶ 156 & n.8, ¶ 278; see also Transcript of Proceedings held on August 9, 2021 (docketed on Sept. 17, 2021) at 22-23, DE #44.[1]

Following his separation from the NYPD, plaintiff was prosecuted by the Nassau County District Attorney's Office, but was found not guilty on all charges tried before a jury at his first criminal trial, and was thereafter found guilty of a trespass violation at a bench trial.  See id. ¶¶ 288-95.  This lawsuit followed.

---

[1] In his motion papers, plaintiff claims that a cash buyout of 60 days of terminal leave would have amounted to $21,214.92, and that VSF benefits are currently worth $12,000 per year.  See Memorandum in Support (Jan. 3, 2022) ("Pl. Mem.") at 6, DE #52.

2

On August 9, 2021, this Court held a settlement conference, with the participation of plaintiff and representatives from the NYPD and the New York City Comptroller's Office. At the conclusion of the settlement conference, the Court transmitted by email to each counsel the Court's recommendation for a settlement of the instant action. The Court's email stated in pertinent part: "Judge Mann's recommendation is for defendant to provide the equitable relief that plaintiff has requested, i.e., reinstatement for the 11 days necessary for plaintiff's retirement to be converted from vested retirement to service retirement, with the corresponding benefits that come with a service retirement." Declaration of Joseph W. Murray (Jan. 3, 2022) ("Murray Decl."), DE #53, Ex. 7, DE #53-7. In response, plaintiff's counsel sent an email asking, "does that include all regular benefits that every service retiree is entitled to like the retired ID card and the 'good guy' letter, Variable Supplement Fund ($12k per year), terminal leave, etc.?" Id., Ex. 8, DE #53-8. Minutes later, before receiving a response from the Court, counsel for plaintiff sent the Court a second email stating that his client had authorized him to accept the Court's recommendation. See id., Ex. 9, DE #53-9.

Meanwhile, counsel for defendants responded to the Court's recommendation as follows:

> I am pleased to inform that defendants accept the Court's settlement recommendation. The NYPD will agree to a settlement under which plaintiff's retirement is converted from a "vested" to "service" status with all corresponding benefits retroactive to May 10, 2017 (this is the actual service retirement date according to NYPD records, not May 9, 2017 as claimed by plaintiff). To be clear, this offer does not encompass any other of plaintiff's demand such as a "good guy" letter or NYPD ID card.

Declaration of Steve Stavridis (Jan. 31, 2022) ("Stavridis Decl."), DE #54, Ex. D, DE #54-4 at ECF p. 4. The Court deemed the City's response a "counteroffer" to the Court's

3

settlement recommendation, since the Court had contemplated that the retired ID card and the "good guy" letter would be included within its settlement proposal. See id. at ECF p. 3. After the Court transmitted the City's counteroffer, counsel for plaintiff accepted the counteroffer by telephone. See id. at ECF p. 2. This Court then advised the parties that they had each accepted the Court's settlement proposal, as modified, and directed the parties to file a Stipulation of Discontinuance by September 13, 2021. See Order (Aug. 11, 2021).

Due to an illness, counsel did not begin to discuss the language to be used in the written settlement agreement until early October 2021. See Motion for Extension of Time to File (Sept. 13, 2021), DE #43; Stavridis Aff. ¶ 26 & Ex. F, DE #54-6 at ECF pp. 13-15. The parties requested a second extension of time to file the Stipulation of Discontinuance because, in computing plaintiff's full service retirement date, an issue arose over the calculation of plaintiff's leave balances, including whether the 30 days during which he had been suspended without pay would be restored and whether plaintiff "ha[d] to make up any time" to reach his full service retirement date. See Second Motion for Extension of Time to File (Oct. 14, 2021) ("10/14/21 Ltr."), DE #45.

The dispute between the parties over the terms of the settlement did not become apparent until on or about November 2, 2021, when counsel exchanged drafts of the written settlement agreement. See Stavridis Aff. ¶ 27 and Ex. F, DE #54-6 at ECF p. 9. In an email dated November 2, 2021, in response to the draft settlement agreement prepared by counsel for plaintiff, counsel for defendants stated:

> NYPD will not agree to providing additional benefits such as item no. 4 of your settlement (60-day terminal leave-time). As for item no. 3, i.e., the $12k retirees receive annually from the Variable Trust Fund, if this is a benefit that

4

>inures to Service retirees, then neither the City nor the NYPD can compel its payment or cause it to be withheld from Service retirees as this runs contrary to ERISA laws. Accordingly, we cannot include it as a term in this settlement agreement.

Stavridis Aff., Ex. F, DE #54-6 at ECF p. 9; see Stavridis Aff. ¶ 28.

After further discussions between the parties failed to yield an agreement, counsel filed a joint letter on November 12, 2021, requesting leave to file cross-motions to compel settlement. See Letter for leave to move to compel settlement (Nov. 12, 2021) ("11/12/21 Ltr."), DE #46. As summarized by defendants, plaintiff insisted on additional terms that were not agreed to as part of the Court's settlement recommendation. Id. at 2. Specifically, after the settlement conference, the parties discovered that plaintiff needed to be reinstated for 42 days, rather than 11, in order for his retirement to be converted from vested interest retirement to service retirement. Id. at 1-2. Although defendants were willing to revise the settlement to allow plaintiff to be reinstated for 42 days so that he would be eligible for a 20-year service retirement, plaintiff also insisted on receiving pay for his terminal leave balances and unused leave balances. See id. at 2; Stavridis Decl. ¶ 28 & Ex. F, DE #54-6 at ECF pp. 9-11. Defendants refused to include these additional terms, which were, in their view, beyond the terms of the Court's settlement proposal. See 11/12/21 Ltr. at 2; Stavridis Decl. ¶ 28 & Ex. F, DE #54-6 at ECF p. 9.

At a telephonic hearing before the undersigned magistrate judge on November 15, 2021, defendants withdrew their request for leave to enforce the settlement and the Court gave the parties a further opportunity to resolve their dispute by November 22, 2021. See Minute Entry (Nov. 15, 2021), DE #47. By joint letter dated November 22, 2021, the parties

informed the Court that they "have not been able to settle the matter." See Letter proposed motion schedule for plaintiff's motion to compel settlement (Nov. 22, 2021), DE #48. This motion by plaintiff followed.

## DISCUSSION

Generally, where a settlement agreement has not been reduced to writing, the Court must examine "whether parties intended to be bound by [the] agreement in the absence of a document executed by both sides." Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 323 (2d Cir. 1997) (citing Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985)); see Powell v. Omnicom, 497 F.3d 124, 129 (2d Cir. 2007). The Second Circuit has identified four factors, commonly known as the Winston factors, to guide this inquiry.[2] See Ciaramella, 131 F.3d at 323. The four Winston factors courts must consider are:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

Ciaramella, 131 F.3d at 323. These factors are used for analyzing oral settlement agreements reached both in court and outside the courtroom. See, e.g., Powell, 497 F.3d at 127, 130-31 (purported settlement put on the record before the Court); Ciaramella, 131 F.3d at 321 (purported settlement reached during negotiations between the parties); Winston, 777 F.2d at 79 (purported settlement reached at discussions held prior to scheduled court conference); see also Vacold LLC v. Cerami, 545 F.3d 114, 120 (2d Cir. 2008) (purported agreement reached

---

[2] The Second Circuit has declined to decide whether federal common law or state law governs the enforceability of oral settlement agreements because "New York law and federal common law were materially indistinguishable." Powell, 497 F.3d at 129 n.1.

6

between parties during negotiations prior to suit). "No single factor is decisive, but each provides significant guidance." Ciaramella, 131 F.3d at 322. Whether the parties intended to be bound absent a written agreement is "a question of fact, to be determined by examination of the totality of the circumstances." Ciaramella, 131 F.3d at 322; see also Vacold, 545 F.3d at 127 (courts must "look at this language and the . . . agreement as a whole, in light of the totality of the circumstances, which includes the five prior drafts").[3]

### 1.   Express Reservation

The parties did not expressly reserve the right not to be bound prior to execution of a written contract. Nevertheless, "although this factor is phrased in terms of 'express' reservations, courts—including the court in Winston—also analyze whether the particular facts and circumstances of the case—such as the nature of the negotiations or the language of any draft agreements—demonstrate an implied reservation of the right not to be bound until the execution of a written agreement." Can't Stop Prods., Inc. v. Sixuvus, Ltd., 17CV6513 (CS)(LMS), 2019 WL 5773739, at *5 (S.D.N.Y. Jan. 18, 2019) (citation omitted), adopted, 2019 WL 1397196 (E.D.N.Y. Mar. 28, 2019) ("Can't Stop Prods. II"); see Winston, 777 F.2d at 81 ("Although neither party expressly reserved the right not to be bound prior to the execution of a document, language in the correspondence does reveal such an intent.").

Here, such a reservation was implied and understood by both parties. The Court's settlement recommendation was stated in general terms as to what benefits plaintiff would be

---

[3] Neither side contends that this case involves a so-called "Type II" preliminary agreement, in which parties "bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement." Murphy v. Inst. of Int'l Educ., 32 F.4th 146, 150-51 (2d Cir. 2022) (internal quotation marks and citation omitted). Therefore, the Court does not analyze the instant dispute under that framework.

entitled to, leaving the parties to work out the specifics, since they, not the Court, were immersed in the details of plaintiff's leave records and employment and disciplinary history, as well as the applicable NYPD retirement and benefit policies. Particularly since the Court's proposal included no upfront payment to plaintiff, the term "corresponding benefits that come with a service retirement"—the key detail of the settlement—was undefined. See Johnson v. Fordham Univ., 11 cv. 4670 (ALC) (MHD), 2015 WL 13745785, at *1, *4 (S.D.N.Y. Sept. 24, 2015) (even though discussions at a judicial settlement conference resulted in a "general agreement . . . on certain basic terms for resolving the case," court concludes that "reservation was plainly understood, since the points of agreement left key details . . . entirely unaddressed"), adopted in relevant part, 2016 WL 450424 (S.D.N.Y. Feb. 4, 2016) ("Johnson II").

In addition, certain provisions in the draft agreements exchanged between counsel demonstrate that "the parties did not intend to bind themselves until the settlement [agreement] had been signed." Ciaramella, 131 F.3d at 324; see Brown v. Cara, 420 F.3d 148, 154 (2d Cir. 2005) (court must "determine whether the language of the contract discloses an intention by the parties to be bound to the ultimate objective"). The draft agreements state that the parties "know its contents and understand its terms and provisions and they have signed this Agreement of their own volition." Joseph Decl., Ex. 11, DE #53-11 at ECF p. 6; id., Ex. 12, DE #53-12 at ECF p. 6. Accordingly, the parties' execution of the written agreement "was meant to signify [their] voluntary and informed consent to the terms and obligations of the agreement[,]" whereas the ultimate failure to sign the agreement demonstrates the withholding of their consent. Ciaramella, 131 F.3d at 324; see Lyman v. New York &

Presbyterian Hosp., No. 11 Civ. 3889(AJN)(JCF), 2012 WL 6135354, at *6 (S.D.N.Y. Dec. 11, 2012), adopted, 2013 WL 427178 (S.D.N.Y. Feb. 1, 2013).

Further, in plaintiff's draft of the agreement, execution of the agreement triggered the commencement of the time period for the City of New York to take certain actions. See Joseph Decl., Ex. 12, DE #53-12 at ECF p. 4. Such a provision indicates a reservation not to be bound until execution. See Kaczmarcysk v. Dutton, 414 F.App'x 354, 355 (2d Cir. 2011) (reversing order enforcing a settlement agreement, based on first Winston factor); Ciaramella, 131 F.3d at 324; Johnson, 2015 WL 13745785, at *4; Lyman, 2012 WL 6135354, at *5. Each party's respective draft agreement also contains a merger clause stating that the agreement "contains all the terms and conditions agreed upon by the parties" and supersedes any prior "oral" or "written agreement entered into prior to the execution of this Stipulation of Settlement[.]" Joseph Decl., Ex. 11, DE #53-11 at ECF pp. 4-5; id., Ex. 12, DE #53-12 at ECF p. 5. "The presence of such a merger clause is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." Ciaramella, 131 F.3d at 324; see CAC Grp. Inc. v. Maxim Grp. LLC, 523 F.App'x 802, 805 (2d Cir. 2013); Kaczmarcysk, 414 F.App'x at 355-56; Stewart v. City of New York, 15 Civ. 7652 (AT) (JCF), 2017 WL 4769396, at *2 (S.D.N.Y. Oct. 20, 2017), adopted, 2017 WL 5897442 (S.D.N.Y. Nov. 29, 2017); Johnson, 2015 WL 13745785, at *4; Lyman, 2012 WL 6135354, at *6. Finally, the language of the whereas clauses[4] in the draft agreements further shows that

---

[4] "WHEREAS, the parties now desire to resolve the issues raised in the action without further proceedings and without admitting any fault or liability; NOW, THEREFORE, FOR GOOD AND VALUABLE MUTUAL CONSIDERATION, RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, IT IS HEREBY STIPULATED AND AGREED . . . ." Joseph Decl., Ex. 11, DE #53-11 at ECF pp. 3-4; id., Ex. 12, DE #53-12 at ECF p. 4.

the parties intended only the terms of the written settlement agreement to be binding. See Ciaramella, 131 F.3d at 324 (whereas clause "demonstrates that only the terms of the settlement agreement, and not any preexisting pact, would legally bind the parties"); Stewart, 2017 WL 4769396, at *2 (whereas clause language "suggests that only the terms of the written agreement would legally bind the parties").

Notably, the record is devoid of evidence that the parties intended to be bound immediately in the absence of a written agreement. See Ciaramella, 131 F.3d at 325 ("[N]othing in the record suggests that either attorney took th[e] statement ["[w]e have a deal"] to be an explicit waiver of the signature requirement."). In fact, the email discussions between counsel regarding the draft settlement agreement demonstrate that the parties expected that a written agreement was required to effect a settlement. See CAC Grp., 523 F.App'x at 804 ("email exchange establishes that both parties understood that the 'deal' would be effectuated by 'documents,' the details of which were still to be settled"). The parties were clearly still negotiating over material terms of their agreement well after the settlement conference, with no understanding between them that an agreement already existed and with every possibility that their negotiations might fail. For example, in a November 2, 2021 email, when it became apparent that the parties did not agree on the terms of the settlement, counsel for plaintiff stated, "I have no problem going forward with this case and you may consider our *offer* to settle withdrawn." See Stavridis Decl., Ex. F, DE #54-6 at ECF p. 8 (emphasis added).

Thus, the first Winston factor weighs against the existence of a binding resolution of the case.

2.  Partial Performance

It is undisputed that there has been no partial performance by either party. See Pl. Mem. at 9. This factor likewise weighs against plaintiff's motion to enforce the purported settlement agreement. See In re Lehman Bros. Holdings Inc., 739 F.App'x 55, 57 (2d Cir. 2018); Lyman, 2012 WL 6135354, at *8.

3.  Agreement on All Terms

The third factor—whether all of the contractual terms had been agreed upon—weighs in favor of enforcement only where "there [i]s 'literally nothing left to negotiate.'" Winston, 777 F.2d at 82 (quoting R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 76 (2d Cir. 1984)). "[E]ven 'minor' or 'technical' changes arising from negotiations over the written language of an agreement can weigh against a conclusion that the parties intended to be bound absent a formal writing." Powell, 497 F.3d at 130; see Ciaramella, 131 F.3d at 325; Winston, 777 F.2d at 82–83. Such changes may "show there were points remaining to be negotiated such that the parties would not wish to be bound until they synthesized a writing satisfactory to both sides in every respect." Powell, 497 F.3d at 130 (internal quotation marks and citation omitted).

It is clear from the totality of the circumstances in this case that the parties had not agreed on all material terms. As noted above, the Court's settlement recommendation was deliberately vague as to the benefits to which plaintiff would be entitled because it was unclear to the Court what corresponding benefits would attach to a conversion to a service retirement. See Velazquez v. Yoh Servs., LLC, No. 17 Civ. 00842 (CM), 2017 WL 4404470, at *3 (S.D.N.Y. Sept. 25, 2017) ("the parties merely agreed to the broad terms of a settlement

11

without deciding how those terms would be implemented"); Johnson, 2015 WL 13745785, at *6 (at settlement conference, parties had not yet resolved "how non-disclosure and non-disparagement requirements were to be enforced"). In other words, there were material elements of a potential settlement that the Court's proposal had left unresolved, and the Court expected that the parties would negotiate the specific terms of the agreement.[5] Once the parties attempted to reduce the purported agreement to writing, it became clear that they had different understandings regarding the "corresponding benefits" referenced in the Court's proposal.

Indeed, "[t]he actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution." Winston, 77 F.2d at 82 (internal quotation marks and citation omitted). Here, when the parties attempted to reduce to writing their purported agreement, it became evident that they had not agreed on all terms of a settlement despite their acceptance of the Court's modified settlement recommendation. Counsel's communications reflect the lack of any mutual understanding as to the benefits to which plaintiff would be entitled under the parties' settlement. As an initial matter, the Court's settlement proposal was based on the parties' mistaken assumption that if plaintiff were reinstated for only 11 days, he would attain the service credit necessary for him to be eligible for a 20-year service retirement. The parties

---

[5] Under New York law, "[i]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 482 (1989); see also In re Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589 (1999) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."). Thus, where the "essential terms of an agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract will result." Brookhaven Hous. Coal. v. Solomon, 583 F.2d 584, 593 (2d Cir. 1978). Such is the case here.

later discovered that the shortfall to plaintiff's eligibility for service retirement was 42, not 11, days.[6] That fact alone demonstrates the existence of open issues that needed to be resolved before a binding settlement could be reached and consummated.

In addition, plaintiff expected that under the terms of the settlement agreement, he would be guaranteed to receive his terminal leave balance, which he calculated at 60 days' pay or its cash equivalent, his unused leave balances and a VSF payout. See *supra* note 1. According to defendants, however, non-party entities are the source of certain benefits that plaintiff is demanding and defendants could not agree to grant plaintiff VSF benefits or pay him his terminal leave balance or other unused leave balances. See Memorandum in Opposition (Jan. 31, 2022) ("Def. Opp.") at 9, 11-12, DE #55.[7] The substantial differences between the draft agreements exchanged by the parties subsequent to the settlement conference (compare DE #53-11 with DE #53-12) amply establish that they had not reached agreement on all settlement terms. See Ciaramella, 131 F.3d at 325 (citing parties' continued exchange of draft agreements with varying terms as evidence that parties "had not yet reached agreement on all terms of the settlement"); Winston, 777 F.2d at 82 ("drafting process revealed several points of disagreement"); Can't Stop Prods., 2019 WL 1397196, at *6-7; see also R.G. Grp., 751 F.2d at 76 ("The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution.").

---

[6] This revelation led to a dispute over whether plaintiff would have to be reinstated for 42 days or, as plaintiff contended, should have 30 days of disciplinary suspension restored, as he was never prosecuted on the disciplinary charges for which he had been suspended. See 10/14/21 Ltr.; Stavridis Decl., Ex. F, DE #54-6 at ECF pp. 8-9.

[7] Defendants contend that, "[w]ith respect to VSF benefits, though defendants could not provide for their payment in the agreement, there was no impediment to plaintiff receiving them once approved for his service retirement." Def. Opp. at 9 n.5.

13

Indeed, the parties' continued bargaining over the benefits that would be afforded to plaintiff, how his leave time would be treated and whether defendants could provide him with all the relief he demanded further demonstrates that the parties had not yet agreed on all material terms. This is simply not a case where "there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." R.G. Grp., 751 F.2d at 76.

### 4. Type of Agreement That Is Usually Reduced to a Writing

The fourth factor, whether the contract is a type typically memorialized in writing, also weighs against enforcement. "Settlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court." Ciaramella, 131 F.3d at 326; see also N.Y. C.P.L.R. § 2104 ("An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered."). "Where, as here, the parties are adversaries and the purpose of the agreement is to forestall litigation, prudence strongly suggests that their agreement be written in order to make it readily enforceable, and to avoid still further litigation." Winston, 777 F.2d at 83. "The complexity of the underlying agreement . . . is an indication of whether the parties reasonably could have expected to bind themselves orally." *In re* Lehman Bros. Holdings Inc., 739 F.App'x at 58 (internal quotation marks, alteration and citation omitted).

As demonstrated by the parties' continued negotiations, the settlement of this action involves sufficiently complex issues with respect to plaintiff's eligibility and entitlement to benefits so as to necessitate a written agreement. See Ciaramella, 131 F.3d at 326

(settlement agreement that contained provisions concerning how future requests for employee references would be handled, prohibiting the plaintiff from reapplying for employment with the defendant, and imposing confidentiality requirements was sufficiently complex to require a writing); Winston, 777 F.2d at 83 ("Although the agreement consisted of only four pages, the parties evidently thought the terms and language used were complex enough to require substantial redrafting."); Can't Stop Prods. II, 2019 WL 1397196, at *7 ("Although the oral agreement was not the most complex that can be imagined, it was sufficiently complicated and detailed that it is of the kind typically reduced to a writing."). In this Court's experience, settlement agreements involving claims of employment discrimination and retaliation are typically reduced to writing, particularly when equitable relief is contemplated by the parties. See Johnson, 2015 WL 13745785, at *6. This is not the garden-variety settlement that is placed on the record "where the defendant agrees to pay X dollars and the plaintiff agrees to discontinue the case and execute a general release." Can't Stop Prods. II, 2019 WL 1397196, at *7. Nor did the Court's recital of the basic terms of the settlement proposal in an email "function[] in a manner akin to that of a memorializing writing." See Powell, 497 F.3d at 131; Johnson II, 2016 WL 450424, at *6 (distinguishing cases where there were "warnings and assurances of consent" on-the-record such that on-the-record settlements were functionally equivalent to written settlements). Accordingly, the fourth Winston factor weighs against enforcement of the purported settlement.

In sum, as each of the Winston factors weighs against enforcement of the settlement, this Court recommends denying plaintiff's motion, because the parties did not intend to be bound by the settlement reached following the August 19, 2021 settlement conference.[8]

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that the District Court deny plaintiff's motion to enforce the settlement.

Any objections to the recommendations contained herein must be filed with the Honorable Roslynn R. Mauskopf on or before June 8, 2022. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED.**

Dated: Brooklyn, New York
      May 25, 2022

                    /s/ *Roanne L. Mann*
                    **ROANNE L. MANN**
                    **UNITED STATES MAGISTRATE JUDGE**

---

[8] The Court nevertheless rejects defendants' contention that plaintiff acted in bad faith in declining to accept a revised settlement offer extended by defendants following the Court's hearing on November 15, 2021. See Def. Opp. at 9-13. Defendants bear some responsibility for the confusion resulting from the Court's settlement recommendation (i.e., that plaintiff's retirement be converted to service retirement, "with the corresponding benefits that come with a service retirement"), in that defendants failed to explain at the settlement conference that certain benefits are the responsibility of non-party entities. As a result, the parties had different understandings of the settlement proposal that they had accepted. Now that the dust has settled, the parties are urged to enter into renewed attempts to reach a resolution of the case.